My name is Markandu Vigneshwaran, appearing on behalf of the petitioner. This case concerns a politically motivated abduction and violent intimidation campaign carried out against the petitioner and her family in Sri Lanka because of her father's support for opposition presidential candidate General Sarath Kuntseva. Counsel, excuse me, I have a question. I was looking at the briefing in this case, I looked at the arguments, I guess. Here's my question. I don't want to talk about the past persecution arguments for now, and they may have merit, but I want to talk to you about the cat argument. How is it that, you know, it looks like there were two sentences devoted in the brief to that. Why wasn't that forfeited? You're honest. That's mainly depend on the same argument I made regarding asylum and withholding. Right, but I guess what I'm saying is that in the opening brief at 18, there are literally two sentences that were written in terms of argument. Isn't that based upon our case law? Wouldn't we just indicate that this was that argument, at least with regards to the cat, was forfeited? You're honest. My intention to raise that argument in my brief, but the argument based on the asylum and withholding argument. But the standard is different, right, for asylum and cat, so it wouldn't be the same argument as to both claims, correct? Yes. Okay, thank you. The principle issue before this court is whether the agency erred in concluding that the cumulative harm suffered by the petitioner did not rise to the level of persecution. I would like to address three points this morning. First, the agency failed to properly evaluate the cumulative severity and the political nature of the petitioner's past harm. Second, the agency improperly relied on distinguishable proceedings. May I ask you a question about your cumulative harm argument? You say that in your brief that there's substantial evidence to support a finding that cumulative harm suffered by the petitioner rises to the level of persecution, but isn't the standard here whether the evidence compels that conclusion? Yes, and, you know, there are many case laws under Ninth Circuit jurisdiction that require cumulative harm analysis, especially in Sarma v. Garland, in this case. So can I ask you if the BIA stated the correct legal standard, discussed all the relevant facts in the record, claimed that they considered everything cumulatively, what more should they have said to satisfy that standard? They should have analyzed exactly all the facts, but they didn't give any detailed analysis, especially in this case, the fact pattern in Sarma and other cases the agency quoted in its decision is different from this current case, Your Honor. But what more should they have said? They said they did it, you know, in the first sentence, considered in the aggregate. They said the petitioner did not seek hospital treatment because she did not sustain serious injuries, only minor bruising, then unknown individuals threw rocks at the respondent's house, surveilled the family, made unfulfilled phone threats. What are the facts that you think they omitted erroneously? Just in this instant case, Your Honor, this was politically motivated abduction, there's kidnapping, overnight restraint, you know, firearms pointed at the applicant's head, and continued intimidation campaign against the applicant's family, threat, violence. I guess my question then to you is this. Did the BIA cite any case analyzing, except for the standard, they cited a case establishing what the standard is for cumulative effects, but did they analyze that by listing out a case that establishes that particular harm that this particular petitioner faced? But my point is, Your Honor, you know, certain requirement in the decided cases in the past does not exist in this particular case. This particular case is different from the previous, you know, the facts. So here, actually, the hospitalization is not required, it's not necessary 100% for past persecution under the Ninth Circuit case. Thank you. Okay, and Your Honor, regarding the future persecution, the government argues that the petitioner's fear is undermined because her parents remained in Sri Lanka after 2010, and because political condition changed. But this court held in Chau versus Mukhesi that the continued presence of family members does not automatically defeat a well-founded fear, particularly where the applicant himself, herself in this case, was directly targeted. Here, the petitioner herself was abducted and threatened. Moreover, the petitioner testified that the Rajapaksha's political structure associated with the earlier persecution had only recently returned to power at the time of the hearing. The immigration judge herself recognized that the political situation was evolving and uncertain in Sri Lanka. Most importantly, however, once the past persecution is established, the petitioner becomes entitled to regulatory presumption of future persecution under HCFR Section 208.13b1, Your Honor. So here, under the case law, under Nauru versus Gonzalez, the burden has then shifted to the government to demonstrate a fundamental change in circumstances sufficient to rebut the presumption. How should we think about the fact that the parents have lived in Sri Lanka safely since 2010? The father's no longer politically active, and that's the reason why the harm that occurred to her took place. The political opposition leader for whom the father worked is now allied with the regime and actually has held cabinet positions in that regime, and there's no evidence that anyone in Sri Lanka has been interested in the petitioner for a very long time. Should that factor into how we think about future persecution? Your Honor, country condition analysis rested primarily in the temporary absence of recent harm to the family members, rather than the meaningful examination of whether the political actors connected to the original persecution no longer had posted a threat. Given the reason to return, at the time of the hearing, the Rajabaksha regime came back to power. That's the son of the original leader, correct? And he has very friendly terms with the opposition political leader for whom the father worked, correct? That's what's in the record. No, the Rajabaksha's brother came to power, but he's not friendly with the petitioner's father. No, to the political opposition leader for whom the father worked, and it was that relationship which is what caused the harm to the petitioner, that political opposition leader has been embraced by the regime, both the original one who put that leader in prison, as well as I believe his son is now the president, correct? No, that's not correct, Your Honor. Okay, I'm just going to look at the record here. It says in 2013, the then current president, Granit Fonseca, who was the opposition leader for whom petitioner's father worked, a presidential pardon, and that no harm has come to Fonseca, and that in 2015, he became the field marshal, which is the highest military rank in that president's regime. And then in 2018, he became the minister of regional development in that administration. And then when that president's, I guess, brother became the president, as of 2019, there's no evidence that any of them are seeking revenge against Fonseca or his past supporters from the 2010 presidential election, which would include the petitioner and her family. As far as I know, Your Honor, the petitioner's father's opposition party became power just at the hearing, just before, at the time of the hearing. So, the father's party is now in power. So, then why would he be persecuted if it's his own party that's in power? Not father's party was in power at the time of the hearing, Your Honor. The father's opposition party was in power. Did you want to reserve the remainder of your time, counsel? Yes. All right. We'll hear from the attorney general. Your Honor, and good morning. I'm Spencer Shuchard for the United States. May it please the court, the government's position in this case boils down to, essentially, that the case can be decided in its favor based on two legal realities, the first being the highly deferential standard of review in this case, and the second being that death threats are not per se persecution. Well, counsel, let me push back and tell you where my concern is here. That there were, first of all, there were a lot more than death threats here. The petitioner and her mother were kidnapped. Everybody was found, the petitioner was found credible. They were kidnapped because of the dad's opposition. They put a gun to their head and said, if dad doesn't stop helping the opposition leader, everybody is going to be killed. And then they faced future threats. So first of all, have I accurately recited the evidence found to be credible? You have, Your Honor. All right. So here's my issue with what the agency did, that the agency used the right words, I will grant the government that, and the burden is very high on petitioner. And the agency said it looked at the harm in the aggregate and then cited some cases that they said supports the determination of the agency. But in my mind, none of the cases which are summarily cited by the BIA or the IJ, although we're looking at the BIA, have harm that is akin to the harm here. I mean, they talk about threats alone, but I mean, this is somebody who is a high-ranking leader whose relatives were kidnapped and threatened with death, with a gun pointed to their head. And then the house was surveilled, rocks were thrown, and the agency looks at these cases in a very summary way. Why is this enough here, given that in my view, the cases aren't similar? Why shouldn't we send it back to the agency to do a more thorough job of looking at the harm in the aggregate to see if it equals past persecution? And I apologize for my very long rambling question. I appreciate the question, Your Honor. I always like to know where the judges have problems. And in this case, I think I would echo a question that was asked of my colleague during his time, which was that I'm not sure what else there is to be said by the agency. It found the facts. It found her credible. He said what happened to her, how she felt. She suffered injuries. She called them not a big deal. And what we have is case law that has facts within it. And I do want to kind of come back to whether or not comparing this to case law is actually a fruitful endeavor. But what we have, if you take a step back, more generally, is you have a detention, we'll call it, that's less than a day, right? It happens overnight. It's brief, relatively speaking, for cases that we know of. Although, yes, I mean, it is brief, but it is two people being kidnapped, held away from their home, a gun taken out, and pointed to the head and said, your dad is a high-ranking leader of the opposition. And if he doesn't stop, you're all dead. Lanza, cited by the immigration judge, the petitioner in that case, there was a home invasion. Gunmen came in. Her babies are there. It forces her to sit in a chair, threatens her at gunpoint. It's a shorter detention. But the facts are similar. We're arguing over minutes or hours of how long this ordeal goes on. Was that cited by the BIA, that case? I don't know if Lanza's in the board decision, but to your earlier point, I do think that the IJ's decision was within the scope here. I don't think the board supplanted. I think it supplemented. It's a fine line, but that's our argument. Although the BIA later said, we do not address respondents' remaining arguments on appeal, as we're really not dealing with what the IJ did, other than we've discussed, right? Correct. Right. So all the stuff, the things that the IJ found regarding nexus about the political opinion and those things, those are left for another day. Right. And this is not a Bourbon case. Correct. Correct. What it said, it does say that it affirms what the IJ did. No clear errors, so we know the findings are in there. The IJ had his reasoning, and the board, I think, is just adding to it. The board, it does cite Salwero Sosa. In that case, there's a man who's beaten and robbed at gunpoint. He gets death threats constantly. That's not persecution. You also have Hussein, right? He is shot at. The bullets are flying. He's in gun battles. He gets death threats, not persecution. Death threats don't start and end these things, even when they're serious. And I would insert, before I assert this, I want to make clear that the government does not dispute the petitioner went through a terrifying ordeal. Right. She had a very frightening week back in August of 2009. And the agency's no persecution finding is not an expression that she's not deserving of sympathy. Well, let's talk about these death threats. Neither of them were delivered with the immediacy that you would want to see from a threat. And I know one of them was at gunpoint, pointed to her face. But consider that her description of the threat is, tell your father that if he does not stop supporting Sarah Fonseca, I will kill his family. Well, what her description is, first they took us there. They tied us to a tree. So my mom started screaming, saying that we hadn't done anything wrong. Please let us go. So one of the people there, he had a gun in his pocket. He pointed the gun to my head. And so he said, if my dad doesn't stop helping Fonseca, our whole family can be killed. Right. The threat, as it's delivered, is undercutting its immediacy because number one, it says, tell your father, right? So implying someone's got to live to tell him something. Number two, it's conditioned on a future event. Tell your father he needs to stop doing what he's doing. Meaning, you know, we will see how this goes. And I can point out that her father did not stop. If that is any indication of how seriously he took it. Her father continued to- Castle, I just have a real problem how you're describing the series of facts in this clinical kind of way. Can you imagine what this person was facing at the moment? They're tied to a tree and being told that they are going to kill their father because of the political actions and whatnot, if they don't comply with the governing power. I mean, I just, the way in which you're describing it, I guess I take issue with because I don't think that is what happens in real life. That is not what a person experiences as these incredibly scary moments are happening to them at the moment. I just, I guess I take issue with the way in which is sort of parsing out, well, you know, it's a future threat. So she must have thought, oh, I must be able to live. I don't think that is how human nature works. I think how human nature works is that these are devastating, incredibly terrifying threats that are being experienced. And the biggest problem I guess I have with what the BIA did is they listed out these series of cases and none of which on their own describe what happened here. They all sort of individually sort of talk about this is not acceptable. And I get that. I understand that that's what they did, but never sort of its cumulative analysis. There's nothing in the BIA order that does that analysis that is required. Don't you think? I guess, let me ask you this. Do you think that this is sufficient with, would it have been better for the BIA to describe how this is consistent with a particular case where all of these things might have happened? I think it might have forestalled this conversation, but I don't think the effect would have been any different if it had added, say, a parenthetical to a guessing at this point. And our job is not to guess. We need to be able to review a record. And here, there is a lack of a record in the order that was issued. I disagree. And I think that the agency understands case law and it understands that the people, the court that sits in review of its decisions also understand case law. So, when it cites a case for us after listing out a series of facts, I think it's entitled to understand that we all know what it is. But these cases that the BIA cited are all different, right? Hussein was not targeted individually, didn't receive personal threats. Gu was detained three days but didn't get any death threats. The police lost interest in him. And Lanza, I don't see, and maybe I missed it, I don't see anything about a gun. Three men did break into her house and threaten her. There also were no other threats while she remained in Argentina. So, if we look at these cases, or at least three out of the four that the BIA cited, and Salguero-Sosa, they really just cited for the standard, right? I don't see them. Their parenthetical doesn't include any description of the facts of that case or the holding. It just states the standard that the BIA must apply cumulative effect review. So, I guess, what should we do with the fact that each of the cases, you could argue, are distinguishable? And it's not clear whether the agency considered each one in isolation or did the full impact cumulative review? I would say, Your Honor, that we can give the agency credit for understanding what these cases say. And you can each, you know, there's nothing, there's never going to be a perfect analog to any individual case, which is why I don't think this back and forth of comparing cases on, like, the continuum between Gu and Guo or between something like Lanza or Flores-Molina is really all that fruitful in the sense is, like, as long as death threats are not, per se, persecution, which we all agree they're not, there has to be a set of facts where death threats and other stuff is also not persecution. And that's why I think the important thing is to focus not on what you've done in other cases, but to focus on the facts of this case and understand that the agency did what it was supposed to do. It understood the task, it cited the standard, it did cumulative effect review. So, counsel, you know, going a little bit to Judge Mendoza's point that, I mean, first, I think that your argument, in general, has a lot of legs. But when I read what the BIA wrote, where they describe the kidnapping, and then they talk about after the kidnapping, the sentence next is, she did not seek hospital treatment because she did not sustain serious injuries, only minor bruising, in a circumstance where the heart of what the claim is, is they kidnapped us and threatened to kill us because dad is one of the opposition. And the next line is talking about, well, she only sustained minor bruising, and then has this list of cases. It's just hard for me to see here that the agency is truly parsing the harm in the aggregate, despite the words that they're using, when you have this horrible event, and they talk about, well, let's move along, there was only minor bruising. I understand where you're coming from, Judge. But remember, the agency has to act on the record that it has. Petitioner didn't testify to any sort of lasting psychological harm. They didn't testify to anything. She herself called her injuries, not a big deal. Other than, so all we know about what happened to her is that she's afraid to return, which is every asylum case. That's not unusual. The agency can't start inventing facts or putting itself in the position of the petitioner saying, that would frighten me, because of course it would. That's built into this thing. She's been found credible. She has a subjectively genuine fear of returning because something terrible happened to her. That's very commonplace. But I don't think, and I want to, this kind of goes to what Judge Mendoza was saying earlier, too. I don't think it's fair to look at what the agency wrote, what I'm saying in defense of the agency, and call it too clinical in the task here. Under this court's law is to look at each fact in and by itself and aggregate it and decide whether that's enough of a quantum of harm that is a clinical task. We can dress it up with, this is terrible and I'm sorry, and of course those things are true, but they don't aid in the actual analysis of what happened. Well, counsel, just to be clear, I think my job is not clinical. I think my job is to look at the overall case and look at the facts as they are. And part of what we do is certainly look at the specific instances of harm that occurred here, but we can't be so detached as apparently the BIA appears to be the way in which they cited this record, and taking and parsing out the different cases with specific facts and never analyzing them in the aggregate. They said those words, but they never did. So, I guess I think your point, but I think that our job is to look at the entire record and look at it from the lens of humans, of how this is actually appearing. And apparently the BIA must have looked at this, not from that, but instead from a very, again, I will repeat it, clinical and parsing out the different facts and not looking at it as a whole, which is what our case law says they need to do. I'm over time. May I respond? Yes. Take the time you need to respond to Judge Mendoza's question, please. I strongly disagree with that characterization. And again, I'll call it unfair. The board has a Herculean task in front of it. You know, it has its 20-odd permanent members and a couple of temporaries with a million-plus case backlog. I don't know how it is supposed to list out facts in a way that satisfies someone's view of what a human would do. It has laws, it has regulations that it has to adhere to under this court's case law. It has to analyze the IJ's answer for clear error. It has to look at what he did under the legal standard de novo. It has to compile that in a way that is reviewable by your honors. If it doesn't do that in a way that's satisfying, that's fine. But I think the court needs to keep in mind that the standard of evidence here is substantial evidence and not substantial evidence for a human. I mean, I understand, and again, we all want to treat these people with sympathy, but I want to make sure that we're going to review this under the correct standard. There's been no allegation of legal error here. The moment that we stop being humans evaluating this is a moment that we lose our jobs. Let's give it to a computer to do that, if that's the approach that you advocate for. But that's not the approach I think our system is thought to be applying. I disagree with that completely. But that's all I'll say for now. Thank you. I have one question. The facts that the BIA cites look incomplete. There's no mention of the gun point threat during the kidnapping. There was a threat six days after the kidnapping that doesn't appear to be mentioned. And the threats were credible enough that two Army officers provided security for the family. So how should we take into account that it looks like even the factual statement or recitation may not be complete here? Unfortunately, the room setup that I have here in this conference room doesn't allow me to look at my electronic copy of the record. But my recollection is that they mention a death threat. I don't recall if it was a gunpoint threat, but I do remember a death threat. And I believe they mentioned a telephonic threat. I don't know if they call it a death threat. But I think, and I have it as listed on page four of the record. But unfortunately, I can't confirm that. You're right. They do say unfulfilled phone threats, but they don't mention the gunpoint threat during the kidnapping. There may be, I know that they might have a recitation of facts perhaps above that when they're describing the petitioners. And again, I'm sorry, I can't be more clear of this. But I don't have that as missing. Apologies for that. Unless my colleagues have any further questions. We thank you for your argument. Petitioner, you have some time left for rebuttal if you want to use it. Your Honor, as I stated before, the BIA did not fully analyze the facts, the harm suffered by the petitioner in this case. Individual cases, they are cited. They talk about particular harm, not the entire harm suffered by the petitioner at one point. The petitioner was a student at that time. He was studying here in the United States. She went back to Sri Lanka on vacation. A few days after she was harmed, she came back to USA and continued her studies, continued to maintain a fine status. And she graduated. She's found credible. So all the harm she suffered in Sri Lanka that cumulatively rise to the level of persecution required by the Ninth Circuit, Your Honor. And the BIA decision does not mention gunpoint at all. I've just reviewed it. Correct? Yes. Yes, Your Honor. Yes. All right. So finally, I want to point out to the cat relief, Your Honor. In my brief, the opening brief, I've stated the petitioner certainly experienced harm in the past by the government supporters in Sri Lanka that if the petitioner is forced to return to Sri Lanka, she would suffer torture. In fact, I referred in that argument by reference of what happened during the asylum argument, Your Honor. Those are the facts patterns applicable here. All right. We thank counsel for their arguments. The case just argued is submitted.
judges: BENNETT, KOH, MENDOZA